**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5145

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

MICHAEL ABRAMOWITZ, *et al.*,

*Plaintiffs-Appellees*,

v.

KARI LAKE, *et al.*,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-00887-RCL, The Honorable Royce C. Lamberth, District Judge

_____

## PLAINTIFFS-APPELLEES' OPPOSITION TO
## DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR AN
## ADMINISTRATIVE STAY AND PARTIAL STAY PENDING APPEAL

_____

April 28, 2025

WILLIAM B. SCHULTZ
MARGARET M. DOTZEL
BRIAN J. BEATON, JR.
    *Counsel of Record*
ZUCKERMAN SPAEDER. LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800
Fax: (202) 822-8106

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellees certify as follows:

**A.    Parties and *Amici***

All parties, intervenors, and *amici* appearing before the District Court and in this Court are listed in the motion for a stay filed by Appellants.

**B.    Ruling Under Review**

Appellants' motion for a stay identifies the ruling at issue in this case.

**C.    Related Cases**

This case has not previously been before this Court. Appellants' motion for a stay identifies the related cases before the District Court as well as the related case on appeal.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE..............................................................3

I.    Factual Background ......................................................................3

II.   Statutory Background ..................................................................5

III.  Procedural History .......................................................................7

STANDARD OF REVIEW ..................................................................7

ARGUMENT .........................................................................................8

I.    The Government is Unlikely to Prevail on the Merits. ..................8

      A.    Defendants Acted Unlawfully and They Have not Argued
            Otherwise................................................................................8

      B.    Plaintiffs' Claims Were Properly Adjudicated by the District
            Court........................................................................................9

            1.    Plaintiffs are not Subject to Channeling. ...................9

            2.    Defendants Took Discrete and Final Actions. ..........13

      C.    The District Court's Preliminary Relief is Appropriate and
            Properly Tailored..................................................................15

II.   The Government Has Not Shown Irreparable Injury. ...................19

III.  Plaintiffs Will be Irreparably Injured if the Preliminary Injunction
      is Stayed and the Public Interest Weighs Against a Stay............20

CONCLUSION ....................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019)..................................................10

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
598 U.S. 175 (2023)..................................................13

*Biden v. Feds for Med. Freedom*,
144 S. Ct. 480 (2023)..................................................11

*Bosco v. United States*,
931 F.2d 879 (Fed. Cir. 1991) ..................................................11

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021) ..................................................8

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012)..................................................10, 13

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023)..................................................11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)..................................................12, 13

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
560 F.3d 495 (D.C. Cir. 2009)..................................................12

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
119 F.4th 58 (D.C. Cir. 2024)..................................................7

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................22, 23

*Meina Xie v. Kerry*,
780 F.3d 405 (D.C. Cir. 2015)..................................................15

*Montanans For Multiple Use v. Barbouletos*,
568 F.3d 225 (D.C. Cir. 2009) ..................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................8

*Nken v. Holder*,
    556 U.S. 418 (2009) ...............................................................7, 20

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................................15

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ..................................................2

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ..............................................17

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) .................................................................12

*United Steel v. Mine Safety & Health Administration*,
    925 F.3d 1279 (D.C. Cir. 2019) ..............................................17

*Widakuswara v. Lake*,
    No. 1:25-CV-1015, 2025 WL 1166400
    (D.D.C. Apr. 22, 2025) ............................................. 8, 9, 10, 14, 15

**STATUTES**

22 U.S.C. § 6201 .............................................................................6

22 U.S.C. § 6202 .........................................................................6, 7

22 U.S.C. § 6204 .............................................................................6

5 U.S.C.A. § 706 ...........................................................................17

**OTHER AUTHORITIES**

Pub. L. No. 103-236 (1994) ...........................................................6

Pub. L. No. 80-402 (1948) .............................................................6

Pub. L. No. 94-350 (1976) .............................................................6

*Structure*,

    U.S. AGENCY FOR GLOBAL MEDIA, (last accessed Apr. 27, 2025) ........................4

*USAGM, Senior Advisor Kari Lake cancels obscenely expensive*
    *15-year-lease that burdened the taxpayers and enforces Trump's*
    *Executive Order to drastically downsize agency*,

    U.S. AGENCY FOR GLOBAL MEDIA (last accessed Apr. 27, 2025) ....................4, 5

## REGULATIONS

Exec. Order No. 14,238, 90 FED REG. 13043 (Mar. 14, 2025)..................................4

# INTRODUCTION

The Administrative Procedure Act requires that the government explain the bases for its actions, and that those actions be consistent with the governing law. And the Constitution requires respect for the proper separation of powers. Defendants in this case disregarded both in sweeping fashion when they shuttered Voice of America (VOA) with no explanation or rationale.

Defendants' motion before this Court relies on mischaracterizations of the District Court's preliminary injunction and the proceedings before the District Court. First, many of the issues raised by Defendants do not bear on *this* litigation whatsoever. *This* litigation concerns VOA only, not grantee networks, so any arguments related to the applicability of the Tucker Act to grant agreements do not apply. Defs' Mot. at 11–18, 23–24. Second, Defendants treat the District Court's order as a permanent injunction rather than what it is—an injunction "tailored to undoing the agency's unlawful actions in furtherance of the Executive Order and returning to the pre-March 14 status quo." Add. 5. *See* Defs' Mot. at 24, 26.

Defendants accuse the District Court of micromanaging agency decisionmaking and impeding the ability to take individualized personnel actions, but those attacks misunderstand the ordered relief. Until their motion for a stay in the District Court, Defendants never raised the prospect of needing to take any such personnel actions. But regardless, had Defendants waited until the District Court

resolved their stay motion (less than 20 hours after the motion was filed) before submitting their motion in this Court, they would have understood the tailored nature of the District Court's relief that in no way goes beyond "a stopgap measure … intended to maintain a status quo." Add. 5 (quoting *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012)).

Once the brush is cleared away, the flaws in Defendants' motion are clear. As the District Court properly found, Defendants failed to provide any reasoned basis for their actions—forcing VOA to go dark for the first time in its 83-year history, utterly ignoring VOA's statutorily mandated operating requirements, placing over one thousand employees on administrative leave, noticing the terminations of hundreds of contract-employees, and reducing necessary operational capacities. The District Court also found that Defendants provided no defense to Plaintiffs' arbitrary and capricious claims. It convincingly and properly found that the threshold issues raised by Defendants do not pose a barrier to Plaintiffs' case, and that Defendants thus have not shown the strong likelihood of success on the merits that they must for relief at this juncture. Nor can Defendants show their own irreparable harm, which is necessary for them to obtain a stay now.

Before the District Court, Plaintiffs explained how Defendants' illegal actions continue to irreparably harm them. That harm compounds every day, as VOA listeners worldwide look elsewhere for their news, as VOA's operational capacity

continues to languish, and as VOA employees continue to face tremendous uncertainty. In the almost week since the District Court ordered preliminary injunctive relief, Defendants have willfully failed to comply with the District Court's order. VOA remains dark now as it has since March 15, 2025, despite the preliminary injunction. This Court should not reward Defendants' gamesmanship as Plaintiffs suffer compounding irreparable harm that the District Court properly remedied. For all of these reasons, Defendants have not satisfied the high burden they face when seeking relief in this Court.

## STATEMENT OF THE CASE

### I.    Factual Background

VOA launched in the most precarious of times during the height of World War II. Its mission was simple, but powerful: counter Nazi propaganda through truthful, impartial reporting delivered to German citizens who lived under the Nazi regime. *See* Add. 8, ¶ 5. Before the actions at issue in this case, VOA provided comprehensive, multimedia reporting in 49 languages to an estimated 362 million people across the globe on a weekly basis.  It employed approximately 1,300 employees, including at least 1,000 journalists, and more than 500 personal services contractors (PSCs), many of whom deliver truthful reporting to those living abroad. Add. 7–8, ¶¶ 1–2. Voice of America is one of six global media organizations within

the United States Agency for Global Media (USAGM). *Structure*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/yc4hrrek (last accessed Apr. 27, 2025).

On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" VOA's "statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14,238, 90 FED. REG. 13043, 13043 (Mar. 14, 2025) (also available at https://tinyurl.com/2wue2bt7) ("March 14 Executive Order"); *see* Add. 12, ¶ 23. One day later, on March 15, 2025, at 8:59 am, nearly all USAGM employees, including approximately 1,300 employees of VOA, received notice from USAGM that they were being placed on administrative leave "until further notice." *USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that burdened the taxpayers and enforces Trump's Executive Order to drastically downsize agency*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/3f5jdumn (last accessed Apr. 27, 2025) (hereafter "USAGM Release"); Add. 12, ¶ 23. USAGM did not provide a reason for placing VOA employees on administrative leave.

On March 16, 2025, USAGM notified VOA's 500 PSCs that they would be terminated on March 31, 2025. Add. 12, ¶ 26. Many of the PSCs are key journalists and some are on J-1 visas that will expire 30 days after they are terminated and fear that they will be targeted and imprisoned by their authoritarian home countries if

forced to return. Add. 14, ¶ 34. USAGM once again did not provide a reason for the termination notices.

On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and to request the respective missions to place all locally employed staff on administrative leave. Add. 12, ¶ 25. As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years. Add. 12, ¶ 27.

These actions were taken by the Defendants in this case. *See* USAGM Release (featuring commentary from Kari Lake, concerning USAGM's personnel actions following executive order). And Defendants have made clear that the cessation of VOA's broadcasting and reporting activities will continue, and that they plan to dismantle VOA. A March 15, 2025, USAGM press release states that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." *Id.*

## II.    Statutory Background

VOA was created by a federal statute, and its statutory duties and obligations are codified into United States law as the result of several different pieces of legislation enacted over the last eighty years.

In 1948, Congress passed the United States Information and Exchange Act of 1948 (the Smith-Mundt Act). Pub. L. No. 80-402 (1948). The Smith-Mundt Act created "an information service to disseminate abroad information about the United States, its people, and policies promulgated by the Congress, the President, the Secretary of State and other responsible officials of Government having to do with matters affecting foreign affairs." Pub. L. No. 80-402, tit. I § 2(1). With the Smith-Mundt Act, VOA was codified into law.

Congress codified the entity's charter in the Foreign Relations Authorization Act of 1977. Pub. L. No. 94-350 (1976). The charter amended the Smith-Mundt Act to recognize VOA's importance to United States "long-range interests." *Id.*, tit. II, § 503. In relevant part, the law codified certain statutory operating requirements for VOA. *Id.* (currently codified in 22 U.S.C. § 6202(c)).

Consistent with these missions, in 1994 Congress passed the International Broadcasting Act (IBA), Pub. L. No. 103-236, tit. III (1994), 22 U.S.C. §§ 6201, *et seq.*, which lays out the overarching principles that guide U.S. international broadcasting and insulates U.S. broadcast agencies' newsroom staff from certain executive branch officials who "shall respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency." 22 U.S.C. § 6204(b). *See* §§ 6202(a)(5), (b)(1). These statutory provisions embody the "firewall" between journalists and executive branch officials, including

Defendants, who must not interfere with the reporting at the entities. Today, by law VOA is required to carry out a variety of statutory functions in addition to those mentioned above. *See, e.g.*, 22 U.S.C. § 6202(b)(1)–(10).

## III.    Procedural History

Plaintiffs adopt the discussion of the procedural history in Defendants' motion but add that the District Court denied Defendants' motion for a stay of the preliminary injunction pending appeal minutes after Defendants filed their motion in this Court. The District Court's order rejects several of the arguments raised by Defendants in their motion for a stay, including arguments that the ordered preliminary relief is not appropriate. Add. 4–6. As the District Court explained in that order, the preliminary injunction in this case is properly tailored to undo Defendants' illegal actions while this litigation progresses. *Id.*

## STANDARD OF REVIEW

A stay pending appeal is an "extraordinary remedy," *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quotation marks omitted), intruding "into the ordinary processes of administration and judicial review," *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation marks omitted). The movant must show (1) a "strong" likelihood of success, (2) irreparable injury, (3) that a stay will not "substantially injure the other parties," and (4) that the public interest favors a stay. *Id.* at 426. Courts should be wary of litigants using requests

for "extraordinary relief" to decide the "merits" "on a short fuse." *Does 1-3 v. Mills*,

142 S. Ct. 17, 18 (2021) (Barrett, J., concurring).[1]

## ARGUMENT

### I.     The Government is Unlikely to Prevail on the Merits.

#### A.     Defendants Acted Unlawfully and They Have not Argued Otherwise.

As the District Court noted, Defendants never argued that they did not act in

an arbitrary and capricious fashion. *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL,

2025 WL 1166400, at *13 (D.D.C. Apr. 22, 2025) ("In their briefing before this

Court, [defendants] do not even use the words 'arbitrary' or 'capricious' anywhere,

even though the central holding of the TRO was that the defendants' actions were

arbitrary and capricious…. And at this Court's PI hearing, the defendants opted not

to argue the merits of the arbitrary and capricious challenge despite being given

several opportunities to do so."). Defendants provided no explanation for their

decision to close VOA, and thus, as the District Court held, "took the actions at issue

here without any 'reasoned analysis' as to what was 'statutorily required' under the

EO and what was not." *Id.* at *13 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Moreover, as the District

---

[1] Defendants have also requested an administrative stay of the District Court's preliminary injunction. Such a stay is unnecessary in this case because the parties have thoroughly briefed the issues, and because the District Court has thoroughly explained why a preliminary injunction is necessary and why a stay is not warranted.

Court held, Defendants' actions were likely illegal because they violated the International Broadcasting Act, congressional appropriations legislation, the Take Care clause, and the constitutional separation of powers. *Id.* at \*14–15.

### B. Plaintiffs' Claims Were Properly Adjudicated by the District Court.

#### 1. Plaintiffs are not Subject to Channeling.

In their briefing before the District Court, Defendants never argued that Plaintiffs LaBruto and J. Doe 2, who are personal services contractors not subject to the jurisdiction of the Merits System Protection Board (MSPB), must first raise their claims through administrative channels. While it is unclear whether Defendants argue that the PSC Plaintiffs must do so in their briefing before this Court, the law is clear that the MSPB has no jurisdiction over the PSC Plaintiffs. *Id.* at \*10 (explaining that contractors are not subject to channeling). In any event, Defendants waived any such argument by failing to raise it in the District Court and by failing to raise it adequately in this Court. Defendants are also incorrect with respect to Plaintiff Abramowitz, the only Plaintiff in this case that Defendants argue is subject to channeling.[2]

---

[2] Defendants do not argue that any Plaintiffs in this case must first seek relief in the Court of Federal Claims. Regardless, the District Court correctly rejected Tucker Act arguments. *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at \*9–11 (D.D.C. Apr. 22, 2025).

The District Court properly found that no Plaintiff is subject to administrative channeling because this case is not concerned with challenges to covered personnel actions. *Id.* at *10–11. This case "is not simply an employment dispute," but rather a case premised on violations of the APA and the Constitution due to Defendants' actions aimed at shuttering and dismantling VOA. *Id.* at *11. In other words, Plaintiff Abramowitz's claims are not about employment actions taken against him, but about Defendants' actions taken to close the agency that he is statutorily required to direct. If Defendants had not placed him on administrative leave but still placed almost all VOA employees on leave and closed VOA, Abramowitz's claims would be precisely the same.

Thus, the District Court's holding was correct, and nothing in Defendants' motion shows otherwise. Civil Service Reform Act (CSRA) and Federal Service Labor - Management Relations Statute (FSL-MRS) channeling does not apply simply because the federal government has paired its unlawful acts with an adverse employment action. The CSRA requires that "covered employees appealing *covered agency actions* … proceed exclusively through the statutory review scheme." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (emphasis added). It "govern[s] *employee relations* in the federal sector." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (emphasis added) (internal citations omitted) (labor

10

unions challenging executive orders concerned with federal labor relations must go through administrative process).

Conversely, the CSRA does not strip jurisdiction over claims outside review of the CSRA's covered personnel actions. *See Bosco v. United States*, 931 F.2d 879, 883 (Fed. Cir. 1991) ("The Supreme Court did not rule that the CSRA provided the only means of judicial review of *any* actions affecting federal employees, but rather that it was the only means of review as to the types of adverse personnel action specifically *covered* by the CSRA."). Because Abramowitz is not fundamentally challenging his placement on administrative leave through this lawsuit—he is challenging Defendants' broad, unlawful attempts to shut down VOA—the CSRA does not impact this case.

"[F]ederal courts across the country have time and again held that the CSRA does not strip § 1331 jurisdiction when federal employees challenge something other than a CSRA-covered personnel action. *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 372–73 (5th Cir. 2023) (en banc).[3] That Defendants did indeed take an adverse employment action against Abramowitz does not alter the calculus. *Id.* at 375 ("In a case like this one, where plaintiffs are *not* challenging a CSRA-covered personnel action, § 1331 jurisdiction would not disappear *even if* the Government took CSRA-

---

[3] The Supreme Court later vacated the Fifth Circuit's preliminary-injunction order on mootness grounds. *Biden v. Feds for Med. Freedom*, 144 S. Ct. 480 (2023).

covered personnel actions against them."). Defendants' citations to cases that stand for the uncontroversial proposition that actions premised on covered personnel actions must be channeled through the administrative process do not bear on this case. *See Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 496 (D.C. Cir. 2009) (VOA employees challenging their non-promotion must first seek relief under the CSRA).

Even where the CSRA applies, the Supreme Court has held that claims are exempt from channeling if they meet a three-part test. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994). Claims may proceed in federal district court if "'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13). These factors show that Abramowitz's claims should not be channeled.

*First*, Plaintiff Abramowitz would lack meaningful judicial review absent proceeding in District Court. Simply put, Abramowitz is asking for review and relief that the MSPB cannot deliver: the undoing of Defendants' unlawful shuttering of VOA. *Second*, and for many of the same reasons, Abramowitz's claims are collateral to those that are generally brought to the MSPB. That Defendants placed Director Abramowitz on administrative leave in the midst of their unlawful actions does not

bring this case within the MSPB's ambit. Again, Abramowitz "object[s] to the [Defendants' actions] generally, not to anything particular about" employment-related issues. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 193 (2023). Abramowitz's administrative law and constitutional claims "have nothing to do with the [employment]-related matters the [MSPB] 'regularly adjudicates'—and nothing to do with those they would adjudicate in assessing the" decision to put Abramowitz on administrative leave. *Id.* (quoting *Elgin*, 567 U.S. at 22). *Third*, Abramowitz's claims—concerned with broad government actions to dismantle and shutter VOA and the constitutional separation of powers—are outside of the MSPB's expertise. These claims "raise 'standard questions of administrative' and constitutional law, detached from" any issues related to federal employment. *Id.* at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491).

## 2.    Defendants Took Discrete and Final Actions.

Defendants argue that "Plaintiffs cannot use the APA to circumvent [the CSRA] scheme and launch a wholesale, programmatic challenge to agency actions or personnel policies—that is not cognizable agency action under the APA." Defs' Mot. at 22. This argument depends on a mischaracterization of Plaintiffs' claims, which do not concern a programmatic challenge to personnel policies, so to the extent Defendants merely recast their channeling argument into an argument about agency action, they are mistaken for the reasons explained above and for the reasons

13

explained by the District Court. And Plaintiffs are not alleging a "failure-to-act cause of action under the Administrative Procedure Act" under which the discrete-agency action issue arises, *Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009) (Kavanaugh, J.), but rather challenging *illegal actions the Defendants took* in closing VOA. Defendants' invocation of this issue, which is not even implicated here, is a distraction.[4]

Regardless, Plaintiffs' case is founded on proper challenges under the APA and the Constitution to discrete and final agency actions. As the District Court properly found, it must "review whether agency actions conttheravene the agency's statutorily mandated duties, even if there are a lot of actions at issue." *Widakuswara* 2025 WL 1166400, at *11. The District Court catalogued those discrete and illegal actions in its preliminary injunction opinion, which Defendants entirely fail to address in their motion before this Court. Among other discrete and final actions specifically related to VOA, Defendants (1) "placed 1,042 [USAGM] employees on administrative leave"; (2) noticed terminations of all contracts with over 500 PSC employees; (3) shut down all transmitting capabilities; (4) moved to eliminate all radio broadcast technicians; and (5) indicated their intention to terminate hundreds of union employees. *Id.* at *3. As a result, "VOA is not reporting the news for the

---

[4] Moreover, this issue, to the extent relevant at all, does not impact Plaintiffs' likely successful constitutional claims. *See Widakuswara*, 2025 WL 1166400, at *15.

first time in its 80-year existence" and "[i]ts website has not been updated since March 15, 2025, and radio stations abroad that rely on VOA's programming have either gone dark or air only music." *Id.*

Plaintiffs did not raise, and the District Court did not consider, a "programmatic" challenge to agency policies. The District Court correctly found that each of these discrete actions was likely unlawful and led to the shuttering of VOA. Defendants continue to fail to explain how this case, though premised on *multiple discrete* agency actions, constitutes the type of "judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). *See* Defs' Mot. at 23. And courts, including this Court, have repeatedly rejected the argument that merely taking many illegal actions somehow insulates agency actions. *See, e.g.*, *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (entertaining APA challenge to non-review of visa applications because plaintiffs pointed to "a specific principle of temporal priority that clearly reins in the agency's discretion").

### C.    The District Court's Preliminary Relief is Appropriate and Properly Tailored.

Beyond incorrectly invoking their already-rejected threshold arguments, Defendants also mischaracterize the District Court's preliminary relief. Of course, had Defendants waited to file their motion in this Court, they would have had the

15

benefit of the District Court's order denying their request for a stay, which directly answers their arguments related to the scope of relief.

In their motion, Defendants argue that the District Court ordered "broad relief untethered to particular plaintiffs or claims" and that "[t]o justify wholesale reinstatement of *all* employees and contractors, the district court would have needed to determine that each employment decision was properly subject to challenge in this litigation, that each was unlawful, and that the remedy awarded was available in each case." Defs' Mot. at 19. Defendants back up these assertions with no citations and with no evidence. That is because Defendants are wrong and misunderstand how the relief ordered in this case properly remedies their unlawful actions.

As the District Court explained, its preliminary injunction order does not prevent the Defendants from managing USAGM or VOA, is not a determination of the statutory minimum, and is not overly broad. The District Court's "relief is based on a finding that defendants' actions since March 14, 2025, in their purported attempt to comply with the Executive Order, have likely contravened the APA." Add. 5. The preliminary injunction "is properly tailored relief to order the defendants to reverse their illegal actions and return to the status quo before the illegal actions took place." *Id.* Again, Defendants claim that this is a case about personnel actions and not about illegal actions to shutter an agency which are subject to challenge under the APA and the Constitution. The District Court's preliminary injunction order does nothing

16

more than restore the status quo before Defendants' illegal actions, which is tailored to Defendants' violations and is appropriate preliminary relief at this juncture. Indeed, "[t]he ordinary practice … is to vacate unlawful agency action." *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (quoting *United Steel v. Mine Safety & Health Administration*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)); *see* 5 U.S.C.A. § 706(2) (a reviewing court must "set aside [unlawful] agency action").

The District Court's preliminary injunction goes no further than ordering the relief necessary to maintain the status quo while this case can be fully litigated on the merits. Defendants mischaracterize the District Court's relief by contending that "the court's order does not contemplate individualized determinations of the appropriateness of returning particular employees to work." Defs' Mot. at 25. Because they raised this issue for the first time in their motion for a stay in the District Court, it is not addressed in the District Court's preliminary injunction opinion. But as the District Court explained in its order denying Defendants' motion for a stay, the preliminary injunction "does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order, such as 'misconduct, performance issues, or security violations' to which they allude." Add. 5. Thus, the District Court is not superintending the agency or taking over its personnel management functions. Instead, it is reversing illegal actions that

17

irreparably harm Plaintiffs, and its remedies are tailored to those actions. That is the proper, uncontroversial remedy under the APA and the Constitution.

The District Court's ordered relief is entirely consistent with this Court's recent order in *NTEU v. Vought*, 25-5091, which partially stayed a district court's preliminary injunction to the extent that the preliminary injunction "require[d] defendants to reinstate employees whom defendants ha[d] determined, after an individualized assessment, to be unnecessary" and "insofar as it prohibit[ed] defendants from terminating … employees whom defendants ha[d] determined after a particularized assessment, to be unnecessary." 25-5091, Apr. 11, 2025 Order at 1–2. As the District Court explained, its preliminary injunction restores the status quo *ex ante* but does not prohibit Defendants from making other personnel decisions for reasons such as "misconduct, performance issues, or security violations" because "such execution of normal operations would … be in accordance with the status quo pre-March 14." Add. 6. These were the only types of personnel decisions that in their motion for a stay Defendants claimed were not allowed under the preliminary injunction. It is ironic that Defendants now lean on the need to take individualized personnel decisions, when the genesis of this case is their wholesale shuttering of VOA.

While Defendants do not challenge the District Court's conclusion that Plaintiffs have standing to challenge the closure of VOA, Defs' Mot. at 19-20, they

appear to argue that Plaintiffs do not have standing to challenge the principal method used to implement that decision: the placement of nearly the entire VOA staff on administrative leave and the proposed termination of hundreds of employees. Defendants barely mentioned standing for injunctive relief in the District Court, relegating it to a footnote in their briefing. To the extent they do so here, the District Court already convincingly rejected their argument, and it is wrong regardless. Plaintiffs have standing to seek preliminary injunctive relief that undoes the harm that Defendants have caused them and that leaves in place the status quo as the District Court considers the APA and constitutional claims. By way of an example, while this case is pending, Abramowitz, the director of VOA, cannot run VOA as is statutorily required if VOA has no employees and no broadcasting capacity.

## II.    The Government Has Not Shown Irreparable Injury.

As explained above, Defendants' principal argument concerning their own irreparable injury—payment of grants—does not apply to this case and to VOA. Defendants' secondary argument—that the preliminary injunction "harms the Agency's ability to control its own operations," Defs' Mot. at 24—is a repackaging of Defendants' failure to understand the District Court's preliminary injunction, which the District Court explained in its order denying Defendants' request for stay. Defendants hardly attempt to argue that they will be irreparably harmed absent a stay from this Court, and this Court can reject their application on this basis alone.

19

### III.    Plaintiffs Will be Irreparably Injured if the Preliminary Injunction is Stayed and the Public Interest Weighs Against a Stay.

There can be no question that a stay would "substantially injure" Plaintiffs. *Nken*, 556 U.S. at 426. As they did in the District Court and as they do again in this Court, Defendants reframe this litigation and the nature of Plaintiffs' claims in an attempt to defend their illegal actions. This case has never been about "monetary" injury, Defs' Mot. at 25—it is about Defendants' illegal shuttering of VOA and the irreparable harms that flow to the Plaintiffs and the network as a result. The District Court correctly rejected Defendants' attempts to make this case about money and about employment.

As Mr. Abramowitz explained in his April 2, 2025 declaration, Add. 18–20, ¶¶ 1–2, 8–9, in addition to placing approximately 1,300 VOA employees on administrative leave and seeking to terminate the contracts of approximately 500 PSCs, Defendants have cancelled the contracts for news wire services for video, image and content on breaking news, have eliminated African transmitting stations, and have terminated contracts with most of VOA's vendors. Mr. Abramowitz also explained that "[w]ith each passing day it will become increasingly difficult and costly to reinstate or replace cancelled contracts that are needed for basic operations," and that VOA is "losing its audience." Add. 20, ¶¶ 10–11. Finally, Mr. Abramowitz described the "precipitous declines in audience engagement across all

major digital platforms," and that "in the fast-moving online media, every day dark represents major losses in hard-won reach and influence." Add. 21, ¶¶ 12–13.

The District Court's order requires Defendants to immediately bring VOA employees back to work, halt the planned contract cancellations of PSCs, and promptly begin the process of restoring the contracts described above so VOA can continue at the level that it was functioning on March 14, 2025. The District Court entered its order on April 22, and since that time Defendants have willfully failed to comply with the Court's injunction. The morning after the Court issued its injunction, Plaintiff Abramowitz sent Defendants Lake and Morales an email asking about their plans to bring VOA staff back to work, but he never received a response. VOA remains dark, its employees remain at home, and Defendants have not disclosed any plans to resume VOA's mandatory statutory functioning. Keeping the preliminary injunction in place—and ensuring that Defendants comply with it—is particularly important in light of Defendants' evident decision that VOA should not come back on the air.

Moreover, all Plaintiffs in this case have faced irreparable personal harm due to Defendants' illegal actions, and so staying the District Court's preliminary injunction would harm Plaintiffs. By way of an example, if J. Doe 2's contract is terminated, Plaintiff faces the imminent loss of lawful work authorization and the legal right to remain in the United States. Add. 23, ¶¶ 8–10. This sudden and

unjustified action would deprive Plaintiff of any meaningful opportunity to lawfully stay in the country. And as discussed in Plaintiffs' Complaint and opening brief in the District Court, Defendants have not only taken actions to dismantle VOA, but they have justified those actions on the grounds that VOA (or USAGM) is corrupt, rotten, ineffective, and anti-American. Those aspersions irreparably damage VOA's credibility and that of Abramowitz and the other Plaintiffs, who are, by trade, non-partisan, objective professionals. The District Court's relief, which returns VOA to its pre-March 15 state when it reached hundreds of millions of global listeners weekly and enjoyed a stellar reputation as a voice for truth, immediately alleviates this reputational harm. Indeed, simply letting Plaintiffs and VOA carry out the mission—delivering impartial, truthful news to those without access to it—will show that these reputational attacks are unfounded.

Further, the public interest weighs heavily in favor of "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). That is precisely what the preliminary injunction accomplishes, by returning VOA and Plaintiffs to the status quo prior to Defendants' illegal actions. Allowing VOA to carry out its mission is in the public interest and Congress required it, codified it by statute, and appropriated hundreds of millions of dollars in line with VOA's

congressional mandate. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12.

## CONCLUSION

Appellants' motion should be denied.

April 28, 2025                                    Respectfully submitted,

                                    */s/ William B. Schultz*
                                    William B. Schultz
                                    Margaret M. Dotzel
                                    Brian J. Beaton, Jr.
                                    ZUCKERMAN SPAEDER LLP
                                    2100 L Street NW, Suite 400
                                    Washington, DC 20037
                                    Tel: (202) 778-1800
                                    Fax: (202) 822-8136
                                    wschultz@zuckerman.com
                                    mdotzel@zuckerman.com
                                    bbeaton@zuckerman.com

                                    *Attorneys for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the applicable type-volume limitation set forth in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,194 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(f).

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word Office in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *William B. Schultz*
William B. Schultz

## CERTIFICATE OF SERVICE

I hereby certify that, on April 28, 2025, I caused to be filed electronically the foregoing joint brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *William B. Schultz*
William B. Schultz

# TABLE OF CONTENTS

**Relevant Record Materials Under Fed. R. App. P. 8(a)(2)(B)(iii)**

Order Denying Defendants' Motion to Stay Preliminary Injunction,
ECF No. 34 (Apr. 25, 2025)..............................................................................Add. 1

Declaration of Michael Abramowitz, ECF No. 4-5 (Mar. 26, 2025)...............Add. 7

Declaration of Michael Abramowitz, ECF No. 19-1 (Apr. 2, 2025) ..............Add. 18

Declaration of J. Doe No. 2, ECF No. 4-7 (Mar. 26, 2025)...........................Add. 22

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATSY WIDAKUSWARA**, *et al.*,<br><br>     *Plaintiffs*,<br><br>**v.**<br><br>**KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*,<br><br>     *Defendants*. | **Case No. 1:25-cv-1015-RCL**<br>**Case No. 1:25-cv-0887-RCL** |
| **MICHAEL ABRAMOWITZ**, et al.,<br><br>     *Plaintiffs*,<br><br>**v.**<br><br>**KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*,<br><br>     *Defendants*. | |

## <u>ORDER</u>

On April 22, 2025, this Court entered a preliminary injunction (PI) after concluding that the defendants' actions pursuant to Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," violated numerous provisions of the Administrative Procedure Act (APA). *See* Order, No. 25-cv-1015 (RCL) ("*Widakuswara* Docket"), ECF No. 99; Order, No. 25-cv-887 (RCL) ("*Abramowitz* Docket"), ECF No. 29. The Court enjoined the defendants as follows:

> 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM

employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025, 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated, and 3) restore VOA [Voice of America] programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).

Order, *Widakuswara* Docket, ECF No. 99. The Court entered a corresponding PI in *Abramowitz* specifically tailored to the defendants' actions regarding VOA. Order, Abramowitz Docket, ECF No. 29. The defendants have filed a "Motion for a Partial Stay Pending Appeal" in both cases [ECF No. 102, *Widakuswara* Docket] [ECF No. 32, *Abramowitz* Docket]. For the reasons contained herein, the defendants' Motion is **DENIED**.

Of note, the defendants characterize this Motion as a "partial stay" because they claim that they are not seeking a stay of the third portion of the Court's PI: to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." Mot. at 10 (citing this Court's PI Order). Notwithstanding the defendants' characterization, the effect of the order they request would be to stay the third portion of the PI Order: a stay of the first portion of the PI would stay the implementation of the third, because VOA cannot resume programming if all staff remains on leave indefinitely. And in their Motion and accompanying declarations, defendants do not indicate any plans to resume VOA broadcasting, as is required by the third portion of the PI order. The Court therefore analyzes this Motion as one for a full stay of this Court's PI order.

"[T]he factors regulating the issuance of a stay" include "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

Add. 2

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Court addresses each in turn.

As the Court discussed in its Memorandum Opinion accompanying the PI Order, the defendants are not likely to succeed on the merits, and indeed, have opted not to argue the merits of the plaintiffs' arbitrary and capricious challenge at all, which formed the bedrock of this Court's holding. *See Widakuswara v. Lake*, No. 1:25-cv-1015-RCL, 2025 WL 1166400, at *13 (D.D.C. Apr. 22, 2025).

The defendants also do not establish that irreparable harm to the government would occur absent a stay. Regarding the Court's injunction mandating compliance with congressional appropriations statutes, defendants argue that this obligation will cause irreparable harm to the government because the government is "unlikely to recover" the funds in the event that the D.C. Circuit finds that the defendants have been wrongfully enjoined. Mot. at 10. But this is not an accurate characterization of the defendants' harm: financial harm is typically not irreparable unless "the loss threatens the very existence of the movant's business." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Though USAGM must continue to dispense congressional appropriations to RFA and MBN under this Court's injunction, if the D.C. Circuit later holds for the defendants, the money that was disbursed will not "threaten the very existence" of USAGM, and the defendants could seek to recover the funds via other litigation avenues in the future. In short, ordering the payment of congressionally appropriated money to the intended recipient, and for its intended use, does not amount to irreparable harm to the federal government. The indefinite withholding of appropriations from international broadcasting outlets,

Add. 3

however, does cause irreparable harm.  *See Widakuswara*, 2025 WL 1166400, *16 (detailing irreparable harm to the network grantees, including the shuttering of their businesses entirely).

The defendants devote more discussion to the purported irreparable harm to the defendants regarding the impact on their personnel actions.  Defendants represent their understanding of the preliminary injunction as follows: "Rather than narrowing [the injunction] to those employees or contractors who may have been removed or terminated as a result of Executive Order 14238, the Court includes every single 'employee and contractor, who were placed on leave or terminated,' which includes those who may have been placed on administrative leave or terminated for other causes, including, but not limited to, misconduct, performance issues, or security violations."  Mot. at 6.  Notably, this is the first time in this litigation that the defendants have argued that any of the personnel actions taken since March 14, 2025 were taken for any reason *other than* in response to the Executive Order.  And the record belies this belated characterization—indeed, in the March 15 email placing 1,300 VOA employees on administrative leave, the USAGM Director of HR states that the placement was "not for any 'disciplinary purpose.'"  Compl. ¶ 74, *Widakuswara* Docket, ECF No. 1.  If anything, the defendants have consistently represented that every action at issue in this litigation taken since March 14, 2025, has been in direct response to the Executive Order.  *See* Defs.' Opp'n to Mot. for Preliminary Injunction, ECF No. 88, at 3 (listing the actions taken by USAGM since March 14, 2025 and characterizing them as "[i]n furtherance of the OPM Memorandum and the Executive Order.").  The PI therefore orders the defendants to return all those employees and contractors affected by the defendants' actions to their status pre-March 14, 2025, the day the Executive Order issued.  Such relief is properly tailored to undo the defendants' actions here.

Furthermore, the defendants interpret the injunction as "prevent[ing] [USAGM] from executing any employment action, including placing any employee on administrative leave for any reason whatsoever." Mot. at 10. They argue that this "creates irreparable harm by hamstringing the agency's personnel operations," Mot. at 4, and also believe that "the Court has prohibited the Agency from making use of any reductions in force regardless of reason," Mot. at 7. But the Court's preliminary injunction does not reach so far. The injunction is tailored to undoing the agency's unlawful actions in furtherance of the Executive Order and returning to the pre-March 14 status quo. When USAGM returns to pre-March 14 functioning, as is required by the PI, the injunction does not prevent USAGM from executing personnel decisions for reasons unrelated to the Executive Order, such as "misconduct, performance issues, or security violations" to which they allude—such execution of normal operations would, to the contrary, be in accordance with the status quo pre-March 14.[1]

This is not, as the defendants believe, a determination by the Court that USAGM's status pre-March 14, 2025 is the "benchmark for minimum statutory compliance." Mot. at 2. This Court's relief is based on a finding that defendants' actions since March 14, 2025, in their purported attempt to comply with the Executive Order, have likely contravened the APA. Because a PI "is a stopgap measure . . . intended to maintain a status quo,'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012), it is appropriately tailored relief to order the defendants to reverse their illegal actions and return to the status quo before the illegal actions took place.

---

[1] The defendants also argue that "[t]he injunction prohibits [USAGM] from engaging in contract negotiations, oversteps [USAGM's] broad discretion in setting terms of the grant agreements, and prevents [USAGM] from finalizing any subsequent contract termination even if [USAGM] determines that the contracts are unnecessary for the agency to fulfill its statutory functions." Mot. at 7. But the PI does not bar any of these activities. USAGM can still, with this PI in place, take actions pursuant to its statutory mandate and in compliance with the APA. The actions that the plaintiffs challenge in this lawsuit likely contravene the APA, as the Court has found. *See generally Widakuswara*, 2025 WL 1166400.

As for the final two *Hilton* considerations, the issuance of the stay will "substantially injure the other parties interested in the proceeding." *Hilton*, 481 U.S. at 776. Immediate compliance with the PI is necessary to avert the irreparable harm that is soon to befall the plaintiffs. *See Widakuswara*, 2025 WL 1166400, at *16–17 (detailing the irreparable harm to the plaintiffs absent injunctive relief). And staying the Court's PI is not in the public interest, particularly given that absent the PI, the defendants will continue their actions in contravention of numerous federal laws, including the International Broadcasting Act, relevant congressional appropriations acts, and the APA.

For the foregoing reasons, it is hereby **ORDERED** that the defendants' Motion for Partial Stay Pending Appeal is **DENIED**.

The defendants also request that "even if the Court is not prepared to issue a stay that lasts throughout appellate proceedings," that "the Court issue a temporary stay of these aspects of the injunction until the D.C. Circuit resolves a motion for a partial stay that Defendants intend to file" later today. Mot. at 4. For the same reasons explained *supra*, this request is **DENIED**.

**IT IS SO ORDERED.**

Date: April 25, 2025
3:45 P.M.

Royce C. Lamberth
United States District Judge

Add. 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ *et al.*,

      *Plaintiffs,*

   –v.–

KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*;

VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*;

      and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

      *Defendants.*

**Case No. 25-cv-00887**

# DECLARATION OF MICHAEL ABRAMOWITZ

1.　　I am the director of the Voice of America (VOA), the largest United States-funded international broadcaster. Until recently, VOA provided multimedia cultural programming and news in 49 languages and reached an estimated 362 million people across the world weekly. VOA falls under the umbrella of the United States Agency for Global Media (USAGM), and its work is overseen by the chief executive officer of USAGM.

2.　　Before the actions at issue in this case, VOA employed approximately 1,300 employees in total, including around 1,000 journalists. Approximately 500 of VOA's employees, including approximately 450 journalists and representing approximately forty percent of VOA's workforce, are personal services contractors (PSCs), who work fulltime under contract with VOA,

an arrangement that has become increasingly prevalent in government in recent years. Many of these PSCs are key VOA journalists and some come from authoritarian countries and moved to the United States to deliver truthful reporting to those living abroad.

3.    On April 19, 2024, Amanda Bennett, then the CEO of USAGM, with the unanimous approval of the International Broadcasting Advisory Board (IBAB), appointed me to be the director of VOA. Because the VOA director position is currently a senior civil service position, I was also required to apply to the federal government's Senior Executive Service. My application was approved by the federal Office of Personnel Management on June 11, 2024.

4.    I have dedicated much of my life to public service. Prior to becoming the director of VOA, I was the president of Freedom House, a nonprofit organization that promotes democracy and human rights, from 2017 to 2024. Before that, I was the director of the United States Holocaust Memorial Museum's Levine Institute for Holocaust Education. The bulk of my career has been devoted to journalism. I spent 24 years as a journalist at *The Washington Post*, where I was national editor and then a White House correspondent.

5.    VOA launched during the height of World War II in 1942. Its mission was to counter Nazi propaganda through truthful, impartial reporting delivered to German citizens who lived under the Nazi regime.

6.    Since that time, VOA has expanded to be a global voice for telling America's story to the world. It has modeled freedom of speech and freedom of the press, and it has demonstrated those values every day through its reporting to audiences living under authoritarianism and other countries where authoritarians are spreading false narratives about the United States.

7.    During the Cold War, VOA broadcasts reached behind the Iron Curtain and disseminated truthful reporting to those living under Soviet rule. For example, world-famous

Add. 8

Czech tennis star Martina Navratilova has recalled listening to VOA broadcasts while living under the Soviet regime. Likewise, VOA reporting was a key source of news for student protestors at Tiananmen Square in 1989, and it continues to reach Chinese listeners who have no other access to reliable news and information. Because delivering truthful, impartial reporting to those living under authoritarian regimes has always been a threat to those regimes' existence, authoritarian regimes have consistently sought to block access to VOA programming. Many of VOA's journalists, who hail from such countries and who speak directly to these audiences, face possible detention and persecution abroad for reporting the news.

8.    Like all news agencies, editorial independence is integral to VOA's success and its ability to meet its mission of accurately, objectively, and impartially reporting the news to a worldwide audience. Through meeting this mission, VOA serves U.S. interests abroad by demonstrating the values of free speech, free opinion, and a free press. Through its journalism, VOA also explains the United States to foreign audiences and provides accurate news and information to those in authoritarian countries deprived of access to such news.

9.    VOA was codified into law by the Smith-Mundt Act in 1948.

10.   Congress codified VOA's charter in the Foreign Relations Authorization Act of 1977. VOA's charter, codified today in 22 U.S.C. § 6202(c), requires that VOA carry out certain broadcasting and news-producing activities.

11.   To maintain VOA's independence and to ensure that VOA and its sister entities remain credible in the eyes of the global public, Congress has mandated that certain principles be followed by newsroom staff and the executive-branch officials that oversee U.S. broadcast entities. Similarly, Congress has devised, via statute, certain structures to help insulate newsroom staff at U.S. broadcast entities from undue political influence.

12.    Consistent with these missions, in 1994 Congress passed the International Broadcasting Act (IBA), which lays out the overarching principles that guide U.S. international broadcasting and insulates U.S. broadcast agencies' newsroom staff from certain executive branch officials.  These statutory provisions embody the "firewall" between journalists and executive branch officials who must not interfere with the reporting at the entities.

13.    By law, U.S. international broadcasting must "be conducted in accordance with the highest professional standards of broadcast journalism" and U.S. broadcast networks must produce "news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6205(a)(5), (b)(1).  Moreover, federal law requires that certain executive-branch officials outside the newsrooms "respect the professional independence and integrity of the [United States Agency for Global Media], its broadcasting services, and the grantees of the [United States Agency for Global Media]."  *Id.* § 6204(b).

14.    Today, by law VOA is required to carry out a variety of statutory functions in addition to those enumerated in its charter and in other provisions of U.S. code.  Under 22 U.S.C. § 6202(a)(1), "United States international broadcasting shall," among other requirements laid out in the statute, "be designed so as to effectively reach a significant audience."  Similarly, Congress mandated that "United States international broadcasting shall include," a variety of programming and operational capacity as described by statute.  *See* 22 U.S.C. § 6202(b)(1)–(10).

15.    Accordingly, through statute, Congress required that VOA broadcast and produce the news to reach wide audiences across the globe, and it prescribed that this news must adhere to high journalistic standards.  Congress also requires that the CEO of USAGM "respect the professional independence and integrity of [USAGM], its broadcasting services, and the grantees of [USAGM]."  22 U.S.C. § 6204(b).

16.    Federal law also diffuses oversight and supervision of U.S. international broadcast entities across numerous individuals in an effort to promote VOA's editorial independence.

17.    Following a number of controversies surrounding former USAGM CEO Michael Pack's running of USAGM and perceived interference with the work of newsroom staff, Congress modified the relationship between the USAGM CEO and the heads of U.S. international broadcasting networks, including VOA.

18.    Congress made these changes through the 2021 National Defense Appropriations Act (NDAA).

19.    Prior to Pack's tenure as CEO, the CEO had full authority to appoint and remove the heads of the broadcast entities as well as members of the entities' boards.

20.    The 2021 amendments, however, require that a Presidentially appointed, Senate-confirmed, and party-balanced board of seven, known as the International Broadcasting Advisory Board (IBAB), approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM.  22 U.S.C. § 6205(e)(1). This structure protects the directors of United States international broadcasting entities from arbitrary removal, and forges consensus around who should lead these entities' non-partisan work.

21.    Donald Trump was elected the 47th president of the United States in November 2024.  On December 11, 2024, then-President-elect Trump announced his intent that Kari Lake lead VOA as its director.  After taking office, however, President Trump fired all members of the IBAB, except the Secretary of State who is a member of the Board.

22.    As Kari Lake has publicly acknowledged, she could not be immediately appointed to be the head of VOA because her appointment requires approval by the IBAB, which is now

vacant.  On March 3, 2025, President Trump appointed Lake as a "Senior Advisor" to Victor Morales, the Acting USAGM CEO.

23.    On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" VOA's "statutory functions and associated personnel to the minimum presence and function required by law."  One day later, on March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA in addition to me, received notice from USAGM that we were being placed on administrative leave "until further notice."

24.    On or before March 14, 2025, Defendants terminated contracts with the Associated Press, Reuters, and Agence France-Presse.  They also notified VOA employees to stop using material from these wire services.

25.    On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and request the respective Missions to place all locally employed staff on administrative leave.  Other employees were also told to expect to be placed on administrative leave following the two-day shutdown period.

26.    On March 16, 500 personal services contractors (PSCs) already on administrative leave—who are fulltime employees and approximately ninety percent of whom are key reporters working to deliver vital news—were informed that they will be terminated as of March 31, 2025.

27.    As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years.  VOA has not produced any journalism since March 15, 2025.  It has not updated its website since that time.  And it has not broadcast over the airwaves since that time.

Add. 12

28.     The above-mentioned actions were implemented and ordered by the defendants in this litigation.  Defendants have made clear that they intend the cessation of VOA's broadcasting and reporting activities to continue indefinitely, and that VOA will be effectively dismantled.

29.     A March 15, 2025, USAGM press release stated that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." VOA is the largest broadcast agency in USAGM, which oversees five other broadcast agencies.

30.     I accepted my appointment to be the director of VOA with the knowledge and understanding that federal law requires, through the statutory firewall, that newsroom staff at VOA and other U.S. broadcast entities be free from interference from certain executive-branch officials so that these staff may truthfully and accurately report the news.  Further, I was aware of the IBAB's role in approving the appointments and removals of the heads of U.S. international broadcast networks, and that this structure was put in place to promote the independence of U.S. international broadcast entities, like VOA, and to ensure that consensus choices run the networks.

31.     I understand that, under federal law, 22 U.S. § 6205, I have a statutory right to remain the director of VOA until the CEO removes me with the approval by a majority vote of the IBAB or until the IBAB votes by a supermajority to unilaterally remove me from my position.

32.     When I accepted this statutorily protected role, it was with the understanding that I would be directing a prominent, reputable news agency that enjoys broad bipartisan support.  It was also with the understanding that VOA has the capacity to meet its statutory obligations to produce and broadcast the news to significant global audiences.

33.     After placing nearly all VOA employees, including me, on administrative leave, defendants are now initiating the mass termination of approximately 500 PSCs, including many of

VOA's most experienced journalists, editors, and technical staff. These personnel—those placed on leave and those whose terminations have been noticed—are essential to VOA's operations and are individuals that I rely upon to fulfill VOA's statutory mission. These actions have led to VOA going dark for the first time in its 83-year history. VOA has not published or aired a single piece of news content since March 15, 2025. Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered.

34. Many of VOA's employees are foreign employees in the United States on J-1 visas. If terminated, they may be forced to return to countries with a practice of imprisoning dissenting voices. Two VOA foreign contributors have already been imprisoned in Myanmar and Vietnam. Recently, state media in an authoritarian country issued death threats to VOA journalists for their work. I worry about the safety of VOA employees.

35. Today, many VOA employees and employees on leave and with personal services contracts are looking for jobs. The longer employees are on administrative leave, the less likely it is that employees will return to VOA if given the opportunity. For the PSCs, if their contracts are terminated on March 31, they will be even less likely—and in the case of foreign employees with terminated visas, potentially unable—to return to VOA if given the opportunity.

36. I thought long and hard about filing this lawsuit, and I came to the conclusion that I had to in order to save an 83-year-old institution that has fought communism and authoritarianism since its inception. I had hoped to help the new VOA director improve the agency, and I had started that process during my tenure, but I have not been given the chance to talk with the new Administration. I believe strongly in democracy and the peaceful transfer of power that has taken place in this country for over 200 years.

Add. 14

37.     When this Administration took drastic action, I felt I had to respond.  I am speaking for all of those who are afraid to speak.  One of my fellow plaintiffs is unnamed because of the fear of retribution from the governments and regimes that he or she fled and came to America to oppose.  And some of my colleagues face imprisonment, torture and possible death if they are returned to their home countries, as they are here on J-1 visas.  As the Director of Voice of America, which was established by Congress, I feel I must act on behalf of the 1,300 employees of VOA to save this important network.

38.     Defendants have effectively taken away my right—and undermined my responsibilities—to lead a reputable and revered U.S. international broadcasting network.  Serving as the head of VOA, the country's largest and most influential government-funded international broadcast entity, is a unique privilege.

39.     Indeed, my entire career, including my decades as a journalist and years spent advocating for a free press and other freedoms, put me in the position to be considered for the directorship of VOA.  I accepted this appointment to be director of VOA with the knowledge and understanding that VOA would continue producing first-rate news and reporting to be disseminated to a global audience and that I could be removed only through the approval by a majority vote of the IBAB.

40.     Defendants' actions have dismantled a network that had hundreds of millions of weekly listeners across the globe and a reputation for delivering truthful and impartial news to those living under authoritarian regimes.  I have not only lost the functional right to lead VOA: VOA has been taken away from me, from VOA employees, and from its worldwide listeners.

41.     Losing the right to continue directing VOA due to defendants' actions is a multifaceted harm.

Add. 15

42.    Moreover, although I have not technically been terminated, defendants' actions have completely dismantled the VOA that existed just 11 days ago and that enjoyed a listenership of hundreds of millions of people across the globe and the reputation to go with that.  When I accepted my position, I took the helm of a strong, independent United States media organization that has earned repute and trust across the world for decades.  And I have directed VOA consistent with Congress's vision.  Of course, as I am now on administrative leave, I simply cannot do my job.  Even if the decision to place me on administrative leave were reversed, allowing defendants' actions to stand will leave VOA incapable of meeting its statutory requirements to produce and disseminate first-rate journalism to global audiences.  In other words, their actions have hampered my ability to meaningfully lead the VOA that Congress created.

43.    Each day to which I am entitled to remain as director and to continue leading the VOA that Congress envisioned is invaluable to me.  Each day that VOA remains shuttered is a day that I lose the right to continue leading this revered institution in meeting its statutory requirements.

44.    Additionally, defendants have justified their actions based on severe, unfounded criticisms of VOA and the broader universe of United States international broadcasting.  Defendant Kari Lake and other members of the administration have stated that USAGM and its networks are rife with fraud, produce anti-American content, and are a waste of taxpayer funds.  These accusations severely harm VOA's reputation as a non-partisan, objective news broadcasting network, and they severely harm the reputations of VOA employees.

45.    That harm to VOA's reputation similarly harms my own reputation and that of my colleagues.  Again, I accepted the VOA directorship because of the stellar reputation VOA has historically enjoyed and the bipartisan support for the network.  That reputation is under attack by

Add. 16

defendants who have effectively suggested that I am a partisan at the helm of a network that does more harm than good to United States interests.

46. Defendants' unfounded criticisms of VOA has also negatively affected how the public perceives me and VOA journalists. Defendants' negative, untrue, and unverified statements are amplified by myriad criticisms that have been levied against me online. In reaction to defendants' statements, members of the public have accused me of supporting censorship and declared that I am unfit to run VOA.

47. Defendants' actions have also strained the goodwill and long-term relationships I have cultivated with our business partners. By abruptly terminating contracts with the Associated Press, Reuters, and Agence France Presse, defendants have fractured these institutional relationships. My credibility, along with VOA's, has been jeopardized.

On this 25th day of March 2025 I declare under penalty of perjury that the foregoing declaration is true and correct.

Michael Abramowitz

Michael Abramowitz

11

Add. 17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL ABRAMOWITZ *et al.* | |
| *Plaintiffs,* | |
| –v.– | **Case No. 25-cv-00887 (RCL)** |
| KARI LAKE, *in her official capacity as Special Advisor to the Acting CEO of the United States Agency for Global Media*; | |
| VICTOR MORALES, *in his official capacity as Acting Chief of the United States Agency for Global Media*; | |
| and | |
| UNITED STATES AGENCY FOR GLOBAL MEDIA | |
| *Defendants.* | |

# DECLARATION OF MICHAEL ABRAMOWITZ

1.      I am the director of the Voice of America (VOA), the largest United States-funded international broadcaster. Until recently, VOA employed approximately 1,300 employees in total, including around 1,000 journalists. Approximately 500 of VOA's employees, including approximately 450 journalists and representing approximately forty percent of VOA's workforce, are personal service contractors (PSCs), who work fulltime under contract with VOA.

2.      On March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA in addition to me, received notice from USAGM that we were being placed on administrative leave "until further notice." In addition, on March 16, 2025, 500 PSCs already on administrative leave—who are fulltime employees and virtually all of whom are working-level

Add. 18

journalists or technical product staff—were informed that their contracts would be terminated as of March 31, 2025.

3.    As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years. VOA has not produced any journalism since March 15, 2025. It has not updated its website since that time. And it has not broadcasted over the airwaves since that time. Its website is frozen, its radio and television channels are looping filler material, and its newsroom is shuttered.

4.    On March 28, 2025, a court in the Southern District of New York issued a temporary restraining order (TRO) in a related matter *Widakuswara v. Lake,* No. 25 Civ. 2390, (S.D.N.Y. Mar. 28, 2025), ECF No. 54, which temporarily prevents any further action to dismantle VOA, including by terminating the 500 PSCs. What that court did not do, however, was terminate the administrative leave for me or the other 1300 employees that were placed on administrative leave and thus VOA broadcasting remains shuttered.

5.    For VOA to meet its statutory obligations, most or all of the 1300 employees that were placed on administrative leave must be brought back. And for the reasons described below, the longer VOA employees are kept on administrative leave, the harder it is going to be for VOA to continue to meet its statutory obligation even if all such employees are taken off of administrative leave.

6.    VOA's staff and journalists throughout the organization have already begun looking for other employment. VOA staff have specialized skills and unique contacts across the globe which will be lost if these current employees move elsewhere.

7.    Overseas stringers (freelancers) also are crucial to VOA's ability to cover breaking news all over the world. Because all stringer contracts (as well as the contracts with organizations

that help VOA identify stringers) have been terminated, unless VOA employees administrative

leave is ended, VOA will quickly lose the ability to reenter into arrangements with stringers as

they will be compelled to enter into other contractual agreements.

8.      Similarly, VOA relies on news wire services for video, image and content on

breaking news, but those contracts have also been cancelled. In addition, contracts with all 18

Africa transmitting stations have been eliminated. These transmitting stations are critical to VOA's

coverage of news to African nations. Until VOA employees administrative leave is ended, VOA is

unable to reestablish those relationships and contracts.

9.      Likewise, contracts with most of VOA's vendors, which allow VOA to operate,

have been terminated. These vendors provide the resources that enable VOA to meet its statutory

mission. Without them there will be no video, no images, no editing, and minimal support

regarding digital, TV and radio transmission.

10.     With each passing day it will become increasingly difficult and costly to reinstate

or replace cancelled contracts that are needed for basic operations. Renegotiation by vendors, new

public competitions, and potential contractor changes increase costs and inefficiencies to the

government. The government will likely receive worse services and goods at higher prices.

11.     VOA is also losing its audience. Until recently, VOA had a weekly audience of 352

million people, the largest audience of any international broadcaster. Now VOA is blacked out on

television and radio, which brought VOA 75% of its audience. As a result of the shutdown,

affiliates will soon have no choice but to make contractual arrangements to substitute other

programming, leaving VOA without affiliates should it remain off air for a significant period of

time.

Add. 20

12.     In addition, for years, VOA has invested in world-class digital media experts, tools, and training to build some of the largest and most loyal online audiences. In just two weeks, VOA has seen precipitous declines in audience engagement across all major digital platforms including but not limited to Instagram, Facebook, YouTube, and X. The numbers are dramatic -- dropping from millions of views and engagements per day down to thousands or less.

13.     A quick return to production might recapture attention, but in the fast-moving online media, every day dark represents major losses to hard-won reach and influence. Audiences will look for different sources of information and as time elapses, VOA will not be able to get back its extraordinary audience share in many countries.

14.     Major events, both domestic and abroad, are represented fairly by VOA and establish baseline understanding in target markets. The longer VOA's steady reporting is absent in target markets, the more state propaganda and disinformation define reality.

On this 2nd day of April 2025, I declare under penalty of perjury under the laws of the District of Columbia that the foregoing declaration is true and correct.

_____

Michael Abramowitz

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL ABRAMOWITZ *et al.*<br><br>*Plaintiffs,*<br><br>–v.–<br><br>KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*;<br><br>VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*;<br><br>and<br><br>UNITED STATES AGENCY FOR GLOBAL MEDIA,<br><br>*Defendants.* | **Case No. 25-cv-00887** |

## DECLARATION OF J. DOE NO. 2

1.      Since 2022, I have been working under a personal services contract for Voice of America (VOA), the largest United States-funded international broadcaster, which provides multimedia cultural programming and news in 49 languages and reaches an estimated 362 million people across the world weekly.

2.      Specifically, I have been working as a journalist in one of the foreign country divisions, which broadcasts across that country and its diaspora (foreign country communities living worldwide).

3.      This division provides reports via television (including on channels in the country for which I report), radio and digital platforms.

Add. 22

4.      My reporting has focused on a range of important issues in the United States that are of interest to the citizens of the country for which I report who live across the world.  For example, I have reported on U.S. elections, Congressional actions, foreign policy, and social issues in the United States and the country for which I report.

5.      On March 14, 2025, I was in my office in Washington D.C. when I discovered that we no longer had access to Reuters or AP.

6.      On March 15, 2025, after learning about the U.S. Agency for Global Media executive order, I drove to my office in Washington, D.C. to pick up my personal camera that I used in my work and stored in my office.  I was denied access to my office.  I subsequently learned that I had been placed on administrative leave.  Shortly thereafter, my access to VOA email was terminated.

7.      On March 16, 2025, I received a Termination Notice and Termination for Convenience Form (via the pay portal) notifying me that my personal services contract (which was not set to expire until June 30, 2025) was being terminated effective March 31, 2025.

8.      If I am terminated on March 31, my J-1 visa will terminate, and I will be required to leave the United States by the end of April 2025.  My spouse's J-2 visa, which allows the spouse of a J-1 visa holder to accompany or join them in the U.S. for the duration of the J-1 program, will also end.

9.      Due to a medical condition, my physician has recommended against air travel for at least the next 5 months.

10.      Because I am losing my job as will my spouse (when the J-2 visa lapses), we will be left with no financial support and no medical insurance. In addition, my spouse and I (expecting

to stay in the United States for several more years) purchased a town house and now have a mortgage we will be unable to pay.

11.     I have asked to file under the pseudonym J. Doe No. 2 because I fear that I may face retaliation for filing this lawsuit from those opposed to the work of VOA.

12.     I am also concerned that the abrupt shut down of VOA could negatively impact the relationships I have built with media outlets and the trust of the audiences I have had the privilege to serve.  Further, my work reaches significant audiences, and so my termination will hurt VOA's ability to meet its statutory mission.

13.     I believe that immediate injunctive relief from this Court is necessary to protect the credibility and the independence of VOA.

On this 25th day of March 2025 I declare under penalty of perjury that the foregoing declaration is true and correct.

  /s/ J. Doe No. 2
J. Doe No. 2

Add. 24