Nos. 25-5144, 25-5145, 25-5150, 25-5151

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

PATSY WIDAKUSWARA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE ACTING CEO OF
THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MICHAEL ABRAMOWITZ, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF VOICE OF
AMERICA, ET AL.,
Plaintiffs-Appellees,

v.

KARI LAKE, IN HER OFFICIAL CAPACITY AS SENIOR ADVISOR TO THE ACTING CEO OF
THE U.S. AGENCY FOR GLOBAL MEDIA, ET AL.,
Defendants-Appellants,

MIDDLE EAST BROADCASTING NETWORKS, INC.,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

RADIO FREE ASIA,
Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellants,

On Appeals from the United States District Court for the District of Columbia
Nos. 25-cv-1015, 25-cv-887, 25-cv-966, 25-cv-907 (Hon. Royce C. Lamberth)

### REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ABIGAIL STOUT
*Attorneys*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*daniel.tenny@usdoj.gov*

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION AND SUMMARY .......................................................................1

ARGUMENT ...........................................................................................................4

**I.**   Plaintiffs are not likely to succeed on the merits of
their claims...................................................................................4

    A. ***The district court erred by ordering reinstatement
of all the Agency's employees and contractors*** .................4

        1.   Plaintiffs cannot disguise challenges to myriad
personnel actions as a challenge to a single
alleged "policy" of "dismantling" ....................................4

        2.   Plaintiffs cannot challenge employment decisions
under the APA ................................................................12

    B. ***The district court erred by ordering the restoration
of the networks' contracts*** .................................................23

**II.**   The remaining factors weigh against an injunction ............................28

CONCLUSION.......................................................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                          **Page(s)**

*American Fed'n of Gov't Emps. v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ................................................................... 12, 14

*Axon Enter. v. Federal Trade Comm'n*,
  598 U.S. 175 (2023) ................................................................................. 16, 17

*Bennett v. U.S. Sec. & Exch. Comm'n*,
  844 F.3d 174 (4th Cir. 2016) ........................................................................ 16

*Biden v. Texas*,
  597 U.S. 785 (2022) ........................................................................................ 7

*Block v. Community Nutrition Inst.*,
  467 U.S. 340 (1984) ...................................................................................... 18

*Department of Educ. v. California*,
  145 S. Ct. 966 (2025) ................................................................................... 31

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ............................................................................................ 7

*Elgin v. Department of the Treasury*,
  567 U.S. 1 (2012) .......................................................................... 12, 16, 20, 21

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ........................................................................ 16

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
  560 F.3d 495 (D.C. Cir.) ............................................................................... 18

*Hubbard v. U.S. Env't Prot. Agency Adm'r*,
  809 F.2d 1 (D.C. Cir. 1986) .......................................................................... 22

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................ 6

*Lujan v. National Wildlife Fed'n.*
  497 U.S. 871 (1990) ........................................................................................ 7

*Maryland v. Corporation for Nat'l & Cmty. Serv.*,
  Civ. No. DLB-25-1363, 2015 WL 1585051 (D. Md. June 5, 2025) ................7

*McMahon v. New York*,
  No. 24A1203, 2025 WL 1922626 (U.S. July 14, 2025) ........................... 12-13

*National Ass'n of Immigration Judges v. Owen*,
  139 F.4th 293 (4th Cir. 2025) ........................................... 19, 20, 21

*National Park Hosp. Ass'n v. Department of the Interior*,
  538 U.S. 803 (2003) ........................................................ 6

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) ................................................ 7

*Office of Pers. Mgmt. v. American Fed'n of Gov't Emps.*,
  145 S. Ct. 1914 (2025) ..................................................... 13

*Reuber v. United States*,
  750 F.2d 1039 (D.C. Cir. 1984) ......................................... 22

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................. 15, 16, 20

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................ 5

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025) ..................................................... 21

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................ 18, 19, 20, 21

*Vitarelli v. Seaton*,
  359 U.S. 535 (1959) ....................................................... 22

**Statutes:**

5 U.S.C. § 1204(a)(2) ......................................................... 14

5 U.S.C. § 7105(a)(2) ......................................................... 14

5 U.S.C. § 7701(g) ................................................................ 14

22 U.S.C. § 6208(c)(5) ........................................................ 24

**Regulatory Materials:**

2 C.F.R. § 200.340(a)(4) ...................................................... 25

5 C.F.R. § 351.901 .............................................................. 15

5 C.F.R. § 1201.27 .............................................................. 15

*Continuing the Reduction of the Federal Bureaucracy*,
   90 Fed. Reg. 13,043 (Mar. 20, 2025) ........................... 9, 10

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Civil Service Reform Act | CSRA |
| Federal Service Labor Management Relations Statute | FSLMRS |
| Middle East Broadcasting Networks, Inc. | MBN |
| Radio Free Asia | RFA |
| U.S. Agency for Global Media | Agency |

## INTRODUCTION AND SUMMARY

Although the district court in this case believed that judicial intervention was necessary to preserve the existence and minimum statutory functions of the United States Agency for Global Media (the Agency) pending the resolution of plaintiffs' claims, it entered a preliminary injunction that sweeps far more broadly. The government appeals the district court's order requiring the reinstatement of all the Agency's employees and contractors and the restoration of grant agreements for Middle East Broadcasting Networks, Inc. (MBN) and Radio Free Asia (RFA) (collectively, the Networks).

As to the employment portion of the district court's order, plaintiffs seek to characterize the district court's unwinding of hundreds of individual personnel actions as if it were merely a single order requiring the Agency to carry out its statutory functions. The district court did issue an order requiring the Agency to carry out a statutory function, and the government has not appealed that aspect of the court's order. What is at issue here is the district court's decision to set aside what it described as a "slew" of other actions, JA23, which neither the district court nor plaintiffs have even attempted to justify on a case-by-case basis.

2

The Agency has significant authority to trim its workforce and to decide for itself the manner and extent to which it will perform discretionary functions. The district court's remedy—an injunction undoing the Executive Branch's decisions about how many employees to devote to such functions—fails to connect to the harm plaintiffs assert and flouts the carefully crafted scheme for challenging employee disputes. The Executive Branch, not district courts, is vested with the authority to make judgments about how many employees are needed to carry out an agency's statutory functions, and who they should be. The injunction rests on the untenable assumption that every terminated employee is necessary to perform the Agency's statutory functions. That injunction effectively appoints the district court to the Executive Branch and bars the Agency from terminating anyone, even though the district court itself later distanced itself from that consequence. JA302 (explaining in its order denying motion to stay the injunction pending appeal that defendants could still "execut[e] personnel decisions for reasons unrelated to the Executive Order," even though the injunction itself provided for no such provision).

3

This Court has already determined that this portion of the district court's injunction should not remain in effect pending appeal. Both the merits and the equities support promptly vacating the challenged portions of the injunction so that the Agency's politically accountable leaders can use lawful tools to bring the Agency in line with the President's policy goals without further delay.

As to the grants portion of the injunction, the government notes that part of the injunction may be moot by the time the Court decides this case, as the Agency will likely have made the last payment under the fiscal year 2025 grants (*i.e.*, the grants that the district court ordered restored). But in any event, the order is flawed because it is fundamentally an order for the government to pay out under a contract. Plaintiffs acknowledge that grants are the "exclusive means" by which the Networks obtain funding. Grant Br. 12. And they acknowledge that, "[b]y law," these grant agreements are permitted to be terminated. Br. 13. Accordingly, when the Agency terminates a grant agreement and the grantee believes the contract termination was improper, a contract dispute arises. By law, such a contract dispute belongs in the Court of Federal Claims—not federal district court.

4

This Court should vacate the challenged portions of the district court's injunction.

## ARGUMENT

### I. Plaintiffs are not likely to succeed on the merits of their claims.

#### A. *The district court erred by ordering reinstatement of all the Agency's employees and contractors.*

##### 1. Plaintiffs cannot disguise challenges to myriad personnel actions as a challenge to a single alleged "policy" of "dismantling."

Plaintiffs rest their entire challenge to a wide swath of employment decisions on the allegation that they are challenging a single policy to "dismantle" the Agency in violation of various statutes requiring the Agency to perform certain duties. *See, e.g.*, Employment Br. 1 (challenging the Agency's "unlawful decision to dismantle itself and cease nearly all its statutorily mandated duties"). But they do not point to any single action that provides concrete directions to carry out the various personnel actions that they actually challenge. Plaintiffs reveal the true nature of their challenge when, despite asserting that this case is about "the application of a categorical policy to dismantle [the Agency]," Employment Br. 14, they acknowledge that they challenge "myriad actions," *id.* They further

5

acknowledge that the personnel actions that they challenge were not uniform; rather, they "includ[e] firing personnel or placing them on leave" and "cancelling contracts." *Id.* But they do not point to any overarching agency directive that mandates which personnel to terminate, which to place on leave, and which to retain, or which contracts to cancel and which to continue. This case thus does not concern a single agency action with broad-ranging consequences, but rather an effort to set aside "myriad," *id.*—or, in the district court's terminology, a "slew," JA23—of individual agency actions on the ground that they all advance some general policy that plaintiffs purport to challenge.

That is not an action cognizable under the Administrative Procedure Act (APA). Rather, it is well established that the APA does not authorize a programmatic challenge to Agency operations, as federal courts do not "exercise general legal oversight of the Legislative and Executive Branches"; they redress concrete injuries to specific interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

Plaintiffs offer no real argument why a dispute "challeng[ing] a . . . generalized level of [g]overnment action" such as the Agency's alleged dismantlement is fit for review. *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

6

568 (1992); *see National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S.

803, 807–08 (2003). There is no agency order mandating termination or

other employment action against any of the plaintiffs, other than the

specific employment actions that were taken against individuals. Thus, the

actual injuries they rely upon—lost employment—result, in their telling,

not from a policy of dismantlement but rather from allegedly unlawful

terminations—"specifically identifiable [g]overnment violations of law."

*Defenders of Wildlife*, 504 U.S. at 568 (quotation marks omitted); *see also*

Employment Br. 30–32 (describing irreparable harms that all stem from lost

employment). Indeed, plaintiffs' assertion of a "policy" is a misnomer; at

bottom, it is a catchall term that plaintiffs use to describe multiple distinct

actions that the Agency took in an effort to comply with an Executive

Order.

    As in *Lujan v. National Wildlife Federation*, plaintiffs attempt to

aggregate defendants' actions regarding "the continuing (and thus

constantly changing) operations of the" agency under its governing

statutes, and seek wholesale judicial review of defendants' management of

the Agency. 497 U.S. 871, 890 (1990). Plaintiffs' challenge to the purported

execution of the alleged plan to dismantle the Agency is no more

7

reviewable agency action than was the Bureau of Land Management's "land withdrawal review program," which was "simply the name" the plaintiffs called the agency's operations, *id.* (quotation marks omitted).

The challenged conduct here bears no resemblance to the final agency actions in, for example, *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), or *Biden v. Texas*, 597 U.S. 785 (2022). Those cases involved the wholesale termination or alteration of an agency program or policy, not generalized guidance that could lead to any of a number of different outcomes. Nor does this case resemble *New York v. Trump*, 133 F.4th 51 (1st Cir. 2025), which plaintiffs themselves characterize as a "categorical funding freeze[]," Employment Br. 15 (quotation omitted)—that is, a single action that mandates the same treatment of a number of agency grants. *See also id.* (describing a single decision to take a number of actions in *Maryland v. Corporation for National & Community Service*, Civ. No. DLB-25-1363, 2015 WL 1585051 (D. Md. June 5, 2025)).

Plaintiffs face another fundamental problem: The district court did not analyze the final agency action that plaintiffs now identify on appeal. Despite plaintiffs' repeated refrain that the Agency had a policy to dismantle the Agency, the district court never made such a finding or

8

conclusion. *See generally* JA1–37. Instead, the district court identified the discrete "agency actions" at issue to be "placement of employees on administrative leave, termination of entire bargaining units of employees, termination of [personal service contractors], and cancellation of grants." JA24. The district court then purported to pass on this "slew" of actions without actually analyzing each one individually or explaining how each one constituted a final agency action. *See* Employment Br. 10 (acknowledging that the district court concluded that "[d]efendants violated the APA by taking a *series* of concerted, close-in-time *actions*" (emphasis added)).

On appeal, plaintiffs distance themselves from that reality, explaining that although it is "true," "as the district court found," that the Agency engaged in "multiple actions," those decisions really "reflect the application of a categorical policy to dismantle" the Agency. Employment Br. 14. But this Court must grapple with the district court's actual conclusions—not what plaintiffs would like them to be. Plaintiffs cannot substitute a new rationale on appeal for the actual reasoning on which the injunction rests.

9

Even on appeal, plaintiffs have failed to identify any overarching policy that would plausibly be subject to challenge. They point to no document or memorandum. Nor do they even explain with any specificity what the policy allegedly was. As discussed, to be subject to challenge, a policy would need to dictate particular steps to be taken, rather than being a general policy steer.

The closest plaintiffs come to identifying any concrete policy is Executive Order 14,238, *Continuing the Reduction of the Federal Bureaucracy*, which the Agency endeavored to implement. *See* 90 Fed. Reg. 13,043 (Mar. 20, 2025). But plaintiffs do not challenge the legality of the Executive Order itself. And the Executive Order is a far cry from—and in direct conflict with—a "policy of dismantlement," which plaintiffs describe as decision to "cease nearly all [the Agency's] statutorily mandated duties." Employment Br. 1. The Executive Order explicitly contemplates the elimination of "*non-statutory* components and functions" "to the maximum extent *consistent with applicable law*" and to "reduce the performance of their statutory functions and associated personnel *to the minimum presence and function required by law*." 90 Fed. Reg. at 13,043 (emphases added).

10

In any event, it is plain that the Agency did not terminate all employees or all programming, which makes clear that there was no policy of complete dismantling or uniform termination. Rather, even on plaintiffs' telling, there were subsequent agency decisions about specific employees and contracts—not all of whom were treated the same—and those are the only final agency actions at issue in this case. Moreover, to the extent that plaintiffs allege that the Agency—despite the absence of any written document saying so, and despite an Executive Order saying the opposite— has decided not to carry out its statutory responsibilities, the district court issued a separate order requiring the Agency to do so. An order about employment cannot be justified on that basis.

Plaintiffs repeat these arguments when responding to the government's argument that employment decisions are committed to Agency discretion under the APA. *See* Employment Br. 16–19. Plaintiffs point to the district court's statement that defendants could "execut[e] personnel decisions for reasons unrelated to the Executive Order," Employment Br. 16 (quoting JA302), as proof that the preliminary injunction was tailored. But that statement fundamentally presumes that the government was not entitled to carry out the Executive Order itself, as

11

to which plaintiffs have identified no legal infirmity. And even that
inadequate reservation of the ability to carry out basic Executive Branch
functions occurred in the district court's post-injunction order denying the
government's motion to stay the preliminary injunction. JA302. By its
terms, the preliminary injunction made no distinction between personnel
decisions that were related or unrelated to the Executive Order, instead
indiscriminately covering all employees and contractors with no apparent
time limit.

Plaintiffs' identification of the International Broadcasting Act to
supply the "statutory guidelines" by which to review the Agency's actions,
Employment Br. 18–19, underscores the fundamental flaw in their claims.
The International Broadcasting Act does not govern the Agency's internal
personnel decisions, but rather describes the substance of the Agency's
functions. As noted, to the extent there are concerns about the Agency's
actual substantive actions, they are governed by the portion of the
injunction relating to the exercise of statutory functions that is not
challenged here. Plaintiffs point to no statutory guidelines by which to
review the Agency's individual employment decisions.

## 2. Plaintiffs cannot challenge employment decisions under the APA.

Stripped of the argument that there was some overarching policy of dismantlement, plaintiffs' case crumbles. Plaintiffs cannot seriously suggest that they are entitled to bring a single APA claim to challenge scores of individual employment decisions. Rather, such decisions would need to be brought by the individual aggrieved employees, would need to be adjudicated based on the particularized facts applicable to each employee, and would be subject to the CSRA. *See Elgin v. Department of the Treasury*, 567 U.S. 1, 5 (2012) (holding that the "[CSRA] provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional"); *American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757–61 (D.C. Cir. 2019) (requiring channeling of constitutional claims). Consistent with this precedent, the Supreme Court recently stayed a district court order that required the government to reinstate Department of Education employees fired as part of a reduction in force. *McMahon v. New York*, No. 24A1203, 2025 WL 1922626 (U.S. July 14, 2025); *see also Office of Pers. Mgmt. v. American Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 1914 (2025)

13

(staying the district court's injunction ordering six departments and agencies to immediately offer reinstatement to over 16,000 employees who were laid off).

The district court's sole reason for concluding that these statutorily prescribed schemes do not apply—and Plaintiffs' argument that they do not apply on appeal—is that the case is "not simply an employment dispute." JA22; Employment Br. 10 (quotation omitted). It is hard to see how an order requiring the reinstatement of employees can be anything else. The district court and plaintiffs seek to justify the reinstatement relief ordered by pointing to Agency functions and operations (*e.g.*, the lack of Voice of America operations or lack of grant funding)—not claims about allegedly unlawful personnel actions. *See, e.g.*, JA22 & n.21 (concluding that it has jurisdiction to hear plaintiffs' claims and that the case is not an employment dispute because the Agency had "reached the breaking point"); Employment Br. 21–22 ("Plaintiffs challenge the evisceration of their jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work of [Voice Of America]." (quotation omitted)). That reasoning illustrates the fundamental disconnect between the relief sought and the alleged legal justification for that relief.

14

The district court ordered reinstatement—the remedy for an unlawful termination claim—all while asserting, as plaintiffs maintain, that this case does not involve a challenge to employment actions. *See, e.g.*, JA21 ("[T]he Court finds that the individual government employee plaintiffs are not barred from challenging the dismantling of [the Agency] because this case is not simply a collection of employment disputes."). It is the Civil Service Reform Act (CSRA), and not the APA, that provides for reinstatement as a remedy. *See* 5 U.S.C. §§ 1204(a)(2), 7701(g). And unions may proceed under the Federal Service Labor Management Relations Statute, a separate part of the CSRA that allows unions representing federal employees to bring labor disputes, including complaints of unfair labor practices, before the Federal Labor Relations Authority (FLRA). *Id.* § 7105(a)(2); *American Fed'n of Gov't Emps.*, 929 F.3d at 755.

Courts cannot evade the CSRA and order reinstatement en masse by recasting a suit as challenging the impact that those terminations have on an agency. The CSRA's comprehensive, exclusive review scheme does not recede when the number of terminations reaches an undefined tipping point that a court identifies as affecting particular functions. In a conclusory fashion, the district court concluded in a footnote that "[t]here

15

is no meaningful review available from the [Merit Systems Protection Board] and [Office of Special Counsel] for the wholesale placement of employees on administrative leave and the silencing [of Voice of America]." JA22 n.22. To the extent the district court relies on volume as a reason to conclude it has jurisdiction, that is not a legal reason to halt an agency from managing its workforce. Indeed, as the stay panel recognized, the MSPB may handle voluminous claims, and class-wide litigation is possible. *See* 5 C.F.R. § 351.901; *id.* § 1201.27. And the CSRA contains no statutory exception based on the number of employees affected or the purported effect of terminations.

Nor does the CSRA's comprehensive, exclusive review scheme recede because "[j]udicial review" would come after "agency review." Employment Br. 21. Judicial review need not be immediately available for a plaintiff to receive meaningful judicial review. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). A statutory scheme can provide for meaningful judicial review even if it requires litigants to first seek relief in an administrative forum, so long as an appeal to an Article III court is available "in due course." *Bennett v. U.S. Securities and Exchange Comm'n*, 844 F.3d 174, 186 (4th Cir. 2016). Meaningful judicial review similarly does

16

not require the involvement of a district court. *See Axon Enter. v. Federal Trade Comm'n*, 598 U.S. 175, 190 (2023). Review of an agency's action in a court of appeals can meaningfully address a party's claim. *Id.* (quoting *Thunder Basin*, 510 U.S. at 215). The Supreme Court has held that the CSRA provides meaningful judicial review where its administrative processes authorize the Federal Circuit to consider and decide constitutional claims. *Elgin*, 567 U.S. at 21.

Hence, courts have upheld the CSRA's exclusivity against "collateral, systemwide challenge[s]," explaining that "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005). Employees may raise arguments with broader consequences in those proceedings, such as that a reduction-in-force exceeds an agency's authority or prevents an agency from carrying out its statutory functions. *Cf. Elgin*, 567 U.S. at 12 (rejecting "an exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal statutes" because "[t]he availability of administrative and judicial review under the CSRA generally turns on the type of civil service employee and adverse employment action at issue"). But that does not turn their employment claims into something else. Plaintiffs argue that they "could not get the

17

relief they seek—an order that [the Agency] resume broadcasting and refrain from dismantling the [A]gency" through administrative channels. Employment Br. 21. But that is inapposite to the relief now challenged on appeal—the restoration of all employees and contractors—and completely ignores that plaintiffs *did* receive that relief in this very case through the portion of the injunction that the government did not appeal, which requires the Agency to restore Voice of America broadcasting.

Plaintiffs cite *Axon Enterprise, Inc. v. Federal Trade Commission*, for the proposition that the issues raised in this case are not the issues the relevant administrative bodies customarily handle. Employment Br. 22. But *Axon* cuts the other way. In *Axon*, the challenges were "to the structure or very existence of an agency"—*i.e.*, that "an agency is wielding authority unconstitutionally." 598 U.S. at 189. *Axon* explicitly distinguished the challenges there from *Elgin* and a "specific substantive decision" like "firing an employee." *Id.* And *Axon* reaffirmed that a challenge to a termination is "precisely the type of personnel action [that is] regularly adjudicated by the MSPB." *Id.* at 187 (quotation omitted).

Plaintiffs draw the wrong inference from the fact that "non-governmental entities and contractors" cannot avail themselves of the

18

CSRA's remedies. The "exclusion" of plaintiffs who are not individual

government employees "from the provisions establishing administrative

and judicial review for personnel action" of the type challenged here

"prevents [them] from seeking review" under other provisions. *United

States v. Fausto*, 484 U.S. 439, 455 (1988); *see, e.g.*, *Block v. Community

Nutrition Inst.*, 467 U.S. 340, 347 (1984) (recognizing that where a statute

omitted a "provision for participation" by dairy consumers, but allowed

participation by dairy producers and handlers, "Congress intended to

foreclose consumer participation in the regulatory process" and "intended

a similar restriction of judicial review"); *Grosdidier v. Chairman, Broad. Bd. of

Governors*, 560 F.3d 495, 497 (D.C. Cir.) ("[T]he CSRA is the exclusive

avenue for suit even if the plaintiff cannot prevail in a claim under the

CSRA.").

Non-governmental entities' exclusion from the CSRA reflects

Congress's considered judgment about the limitations of who should be

permitted to challenge a personnel decision, not a green light to sue in

federal district courts and jump ahead of the employees' own litigation. If

tangentially affected parties could challenge the legality of personnel

actions and obtain reinstatement of terminated employees without the

19

constraints that apply to the aggrieved employees and the unions that represent them, that would turn the structure of the CSRA "upside down." *Fausto*, 484 U.S. at 449. Beneficiaries of government services may claim that an agency is required to carry out some statutory duty, but they have no cognizable interest in the personnel the agency may employ to do so. Outsiders to the CSRA system—who are, at most, indirectly affected by a termination—should not be able to leapfrog the employees whom the legislative scheme seeks to protect and potentially coopt the remedies that those employees may or may not seek in CSRA proceedings.

Plaintiffs briefly suggest, for the first time on appeal, that their claims are not channeled because the President's removal of "members of each CSRA administrative agency has collapsed any implication of jurisdiction-stripping that may have been discernible," citing the Fourth Circuit's decision in *National Ass'n of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025). There, when assessing whether the CSRA stripped the district court of jurisdiction, the Fourth Circuit remanded to the district court the first step of the *Thunder Basin* inquiry—whether Congress's intent to preclude district-court jurisdiction is "fairly discernible in the statutory scheme." *Id.* at 303–04 (quoting *Thunder Basin*, 510 U.S. at 207). Plaintiffs

20

notably decline to acknowledge that *Owen* concluded that all three factors of *Thunder Basin*'s second step were met, meaning the Fourth Circuit concluded that plaintiffs' claims—including their constitutional ones—were the type Congress intended to be reviewed within the CSRA's statutory structure. *Owen*, 139 F.4th at 308–13.

This Court should decline to adopt the Fourth Circuit's novel interpretation of the first step in the *Thunder Basin* test. The Supreme Court has already passed on the question whether Congress intended to preclude district court jurisdiction through the CSRA administrative scheme. And it answered the question, as the Fourth Circuit acknowledges, with a resounding yes. *See* 239 F.4th at 304–05. *See also Fausto*, 484 U.S. at 452 (concluding that Congress's intent to foreclose review was "fairly discernable"); *Elgin*, 567 U.S. at 14 (concluding that the OSC and MSPB are the "exclusive forum" for review of agency personnel action). The Supreme Court explained that the CSRA "prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review," *Fausto*, 484 U.S. at 443, and the "structure of the CSRA evinces Congress's intent because of 'the primacy of the MSPB for administrative resolution of disputes over adverse

21

personnel action,'" *Owen*, 139 F.4th at 304–05 (quoting *Fausto*, 484 U.S. at 449). In short, it was the "elaborate" framework and "painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions" that convinced the Supreme Court that the OSC and MSPB were the "exclusive forum" for review of agency personnel action. *Elgin*, 567 U.S. at 10–12, 14. Questions about OSC's and MSPB's quorums and removal protections were never a part of the Supreme Court's analysis. *See generally Fausto*, 484 U.S. at 439–55; *Elgin*, 567 U.S. at 1. Nor should they be. The Supreme Court has already concluded that reinstatement of these members, at least during the pendency of their litigation, is improper. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025). And the temporary lack of a quorum does not affect the underlying structure and detailed scheme that the CSRA provides in any event.

  *Owen* suggested, but remanded for the district court to decide, whether the President's termination of members of the MSPB compromises the "independence" of the boards and the way that the CSRA was intended to function. Even apart from plaintiffs' forfeiture of this issue, the paucity of briefing on this point even when it was finally raised, and the fact that it would not provide any basis for resolving scores of individual employment

22

claims in the sweeping manner at issue here, it would be extraordinary to suggest that the availability of a cause of action under the APA to resolve an employment matter turns on and off depending on the membership of various bodies at any given moment.

Plaintiffs cannot use the APA to access the reinstatement remedy either. Reinstatement is not an available remedy under the APA because it exceeds courts' historical authority in equity. And the three cases that plaintiffs cite to rebut the government's argument that the APA does not authorize reinstatement are not APA cases and are factually distinct. *See Vitarelli v. Seaton*, 359 U.S. 535, 536 (1959) (explaining that "[t]his case concerns the legality of petitioner's discharge," not the propriety of reinstatement as an equitable remedy); *Hubbard v. U.S. Env't Prot. Agency Adm'r*, 809 F.2d 1, 11 (D.C. Cir. 1986) (concluding, without explanation or analysis, that reinstatement may be available for constitutional violations or First Amendment claims); *Reuber v. United States*, 750 F.2d 1039, 1062 (D.C. Cir. 1984) (concluding, with no historical analysis, that reinstatement may be available for constitutional claims).

**B.** ***The district court erred by ordering the restoration of the networks' contracts.***

23

As to the restoration of grants, at the outset, the government notes that this portion of the appeal may be moot by the time the Court decides this case. The portion of the injunction that requires restoration of the Networks' fiscal year 2025 grant agreements is currently operative after the en banc court granted the Networks' petitions for review, and the Agency has been making monthly grant payments to the Radio Free Asia and Middle East Broadcasting Networks. The Agency expects the last payment of the fiscal year 2025 grant agreement to occur around the end of August or beginning of September. At that time, the Agency's obligations under the preliminary injunction related to the restoration of the Networks' fiscal year 2025 grants will be satisfied and complete. Once the last payment is made, the government will notify the Court, and may move to dismiss the grants portion of the appeal. We nonetheless provide briefing on this issue, which is not currently moot, in case the Court is ultimately called upon to resolve the issue.

The Networks' primary argument is that they have a statutory right to funding. *See* Grant Br. 10–23. The Networks assert that the International Broadcasting Act and the appropriations acts "entitle" the Networks to receive their appropriated funding. Grant Br. 11. But the Networks

24

acknowledge, as they must, that "grants are the exclusive means by which the Networks can obtain the appropriated funding." Grant Br. 12. And the Networks acknowledge, as they must, that the Agency is permitted to terminate those grants in certain circumstances. Grant Br. 12–13 (citing 22 U.S.C. § 6208(c)(5)). But they still cannot answer the question of when and how the Agency can terminate the grant agreement.

On appeal, plaintiffs appear to try out a new theory: The Agency may terminate grants for failure to follow "Congress's direction," not the Agency's "own policy reasons." Grant Br. 13–15 (emphasis omitted). But this theory and line-drawing illustrates the posture the case is in: The parties' dispute is a contractual one—whether the Agency validly terminated the grant agreements. Figuring out the proper ground for termination and then whether a party to a contract properly exercised its termination right under those grounds are classic breach-of-contract inquiries.

Put differently, plaintiffs' argument that Congress left no discretion to withhold grant funds "based on the Executive's policy disagreement[] with Congress," Grant Br. 28, proves the jurisdictional point. The premise of plaintiffs' argument is over the terms of the termination: whether they

25

were legitimate or not. A dispute over whether a grant agreement was permissibly terminated or not is a dispute that belongs in the Court of Federal Claims. Whether the Agency terminated the Networks' grant agreement based on "the Executive's policy disagreement with Congress" (or any other reason) and whether that was a permissible basis is a dispute about the terms of the termination, which is a dispute that belongs in the Court of Federal Claims.

But the substance of the Networks' arguments also rest on shaky ground. The regulation that the Agency relied on to terminate the grant agreements, 2 C.F.R. § 200.340(a)(4)—part of 2 C.F.R. Part 200—has been formally adopted by the Agency and was incorporated into the Networks' grant agreements. It states that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency . . . to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* In other words, the Networks agreed that they, as parties to the grant agreements, were "subject to all Federal laws and regulations pertaining to Federal grants, including . . . 2 CFR Part 200." JA396, 432 (citations omitted). Plaintiffs fail to acknowledge that this case is fundamentally about a policy disagreement they have with the Agency

26

about its program goals and agency priorities—not a disagreement that the Agency or Executive Branch has with Congress.

Plaintiffs' parade of horribles—that the Agency "may grant the Networks the appropriated funds on paper, only to refuse actual payment, would permit [the Agency] to negate Congress's express statutory commands" or render the International Broadcasting Act a "self-defeating statute"—are misplaced. Grant Br. 15 (quotations omitted). The government's jurisdictional argument has always been a venue one. If a grantee claims that the Agency has improperly terminated its grant agreement or improperly refused payment under a grant agreement, then the grantee has a forum—the Court of Federal Claims—to bring that claim. The consequence of the government's argument has never been that grantees would be left wholly without relief; it is that grantees must bring their disputes in the proper, congressionally designated forum, and receive the type of relief that Congress contemplated for such claims. And Congress's determination that the mechanism by which plaintiffs receive funds should be a grant agreement underscores that the statutory requirement is to enter into grant agreements with plaintiffs and thereby provide to plaintiffs all the rights and remedies that a counterparty to a

27

government grant receives. Those rights and remedies include relief in the Court of Federal Claims if the government does not abide by the terms of the agreement.

Finally, there is one point on which the government and plaintiffs appear to agree: the Impoundment Control Act "regulates the relationship between Congress and the Executive—not the government and private parties." Grant Br. 25 (emphases omitted); *see also* Grant Br. at 26 (explaining that "the statute does not address disputes between private parties and the Executive over funding that Congress has specifically directed to private parties" and that the Impoundment Control Act is "narrowly focused on the interchange between Congress and the Executive"). Accordingly, any discussion of the impoundment of funds is irrelevant to the Networks' claims and this lawsuit. *See* JA480–90 (discussing the impoundment of funds).

## II.    The remaining factors weigh against an injunction.

The remaining factors also weigh against an injunction. Plaintiffs' discussion of the harms demonstrates the impropriety of the district court's relief.

28

In their employment brief, despite many assertions that this is not an employment case and that plaintiffs' harms flow from the alleged dismantling of the Agency—not "[]individual staffing decisions"—plaintiffs' irreparable harm centers around the "irreparable harm from the dissolution of their positions." Employment Br. 16, 29 (quotation omitted). After stating that that "this case does not challenge employment actions directed at specific employees," Employment Br. 21, plaintiffs' alleged harm rests on employment actions directed at specific employees. *See, e.g.*, Employment Br. 30 (discussing harm to Mr. Abramowitz); *id.* (discussing harm to "all [Agency]-employee[s]" who face the "elimination of their positions"); Employment Br. at 31–32 (discussing loss of employment harm for plaintiffs Does 3 and 4). Plaintiffs assert that irreparable harm flows from these employees' potential loss of health insurance and wages. But their discussion of the circumstances of individual employees highlights the mismatch between the asserted harms—which relate to the Agency's carrying out its statutory functions—and the sort of individualized circumstances of employees or contractors that might be appropriately considered in the sort of employment dispute that plaintiffs disclaim.

29

Remarkably, plaintiffs state that these employees "cannot obtain damages for such losses through this litigation" because this is an APA case and state that these employees "lack recourse through administrative channels." Employment Br. 32. This is wrong. The government's threshold argument is that these employees can get recourse through administrative channels, and indeed, that is the appropriate place for them to get recourse and challenge any employment determinations. Plaintiffs' asserted harms are not irreparable; they are very much able to be redressed through the carefully crafted schemes that Congress laid out.

Plaintiffs also seek to minimize the government's efforts to carry out the President's Executive Order, but carefully avoid asserting that the Executive Order is in any way unlawful. Like the district court, plaintiffs have made no effort to demonstrate that every single employment action that was taken in response to the Executive Order was unlawful, and thus provide no basis in law or equity for the overbroad relief ordered by the district court. If the Agency, considering the President's direction, believes that a particular employee should not continue to have a position at the Agency, interfering with that personnel decision harms the federal government and the public interest.

30

Plaintiffs also assert "damage to professional reputation and good will" as a source of irreparable harm, citing "[d]efendants' statements" about the Agency as being harmful to the "reputations of Plaintiffs as [Voice of America] employees." Employment Br. 31. But plaintiffs bring no claim relating to reputational damage, and this harm is inapposite to the injunction on appeal: plaintiffs' ordered reinstatement under the injunction is indifferent to plaintiffs' reputational status and does not remedy this alleged harm. In contrast, the preliminary injunction directly and substantially harms both the government and the public interest by preventing the Executive Branch from carrying out the President's directions at the Agency. Plaintiffs get matters backward in asserting that enabling a district-court injunction—rather than the politically accountable Agency leadership—to control important management matters advances the public interest and safeguards the separation of powers. Plaintiffs may disagree with the President's and defendants' assessment about the appropriate size and priorities of the Agency, but such determinations are committed to Article II officials.

As for the grants portion, the Networks' claims are decidedly monetary. Should the Agency fail to pay money to which the Networks

claim they are entitled, they are free to take up such contractual disputes in the proper forum, the Court of Federal Claims. *See Department of Educ. v. California*, 145 S. Ct. 966, 969 (2025) (per curiam). An injunction is therefore unnecessary to prevent any irreparable harm. On the government side of the ledger, the injunction has caused millions of dollars to flow from the public fisc without any bond protection. *See id.*

The Networks argue that the equities tip in their favor because "[i]t [is] not [in] the public interest" for government action to "disregard . . . the expressed will of Congress." Grant. Br. 34 (quotations omitted). But that presents only a selective view of plaintiffs' version of the merits. If the government is correct, then it is the Networks who are disregarding the expressed will of Congress, which specifically directed that contractual claims against the government be brought in a specific forum, the Court of Federal Claims.

## CONCLUSION

For the foregoing reasons, this Court should vacate the challenged

portions of the district court's preliminary injunction orders.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN

*/s/ Daniel Tenny*

DANIEL TENNY
ABIGAIL STOUT
*Attorneys*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1838*
*daniel.tenny@usdoj.gov*

July 2025

33

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of this Court's briefing order because it contains 6,123 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Daniel Tenny*
Daniel Tenny

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals by using the appellate CM/ECF system. Service will be

accomplished by the appellate CM/ECF system.


                                     */s/ Daniel Tenny*
                                     Daniel Tenny